**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
NOVEMBER 19, 2020

*Steree, C. J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
NOVEMBER 19, 2020

*Susan L. Carlson*

SUSAN L. CARLSON
SUPREME COURT CLERK

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | No. 97496-9 |
| | ) | |
| v. | ) | |
| | ) | |
| SIMON ORTIZ MARTINEZ, | ) | |
| | ) | |
| Petitioner. | ) | Filed: November 19, 2020 |
| _____ | ) | |

GONZÁLEZ, J.— Under our constitutions, the State bears the burden of proving the criminal charges it brings with reliable evidence. *See* WASH. CONST. art. I, §§ 9, 22; U.S. CONST. amend. VI. The person charged with a crime has the right to challenge and test the State's evidence. WASH. CONST. art. I, § 22; U.S. CONST. amend. VI. Most evidence is presented through live testimony of witnesses sworn to tell the truth. As a general rule, witnesses may testify only about their own observations, not about what other people told them. This general rule is subject to a long-standing exception for "the fact of the complaint." Under this current iteration of the fact of the complaint exception, the State may offer evidence that a victim of sexual violence told someone about it. In this case, four witnesses were allowed to testify that the victim told each of them she had been

raped. The defendant argues this was error under our hearsay rules and asks this court to abandon the fact of the complaint doctrine. Declining to do so, we affirm.

FACTS

Simon Ortiz Martinez[1] sexually abused his daughter, Y.M., for nearly a decade. 1 Verbatim Report of Proceedings (VRP) (Oct. 24, 2017) at 34. Y.M. testified that the abuse began when she was five years old. *Id.* Martinez stopped Y.M. from playing Barbies with her brothers and told her to go to his room where he molested her. 3 VRP (Oct. 31, 2017) at 535, 538-40. The molestation continued regularly for several years. 1 VRP (Oct. 24, 2017) at 34; 3 VRP (Oct. 31, 2017) at 545, 574, 598-99.

When Y.M. was nine years old, she was alone in the house with Martinez. Her youngest brother had been hospitalized, and their mother stayed at the hospital with him. 3 VRP (Oct. 31, 2017) at 548. Martinez raped Y.M. that night. *Id.* at 555-58. Three months later, Martinez raped her again. *Id.* at 560. Martinez continued to rape and sexually abuse Y.M. regularly until she moved out of the family home in 2014, when she was about 14. 1 VRP (Oct. 24, 2017) at 34, 36, 66-67; 3 VRP (Oct. 31, 2017) at 545, 574, 598-99. Around that time, she told several people about the sexual abuse. 4 VRP (Oct. 31, 2017) at 615, 617. A few

---

[1] The briefs and trial record use several variations of the petitioner's name. We use the name his own counsel uses.

2

months later, Y.M. reported it to authorities. 3 VRP (Oct. 30, 2017) at 488-89, 495; 4 VRP (Oct. 31, 2017) at 624-26.

The State charged Martinez with one count of first degree rape of a child, which required it to prove Martinez raped Y.M. when she was no more than 12 years old. 1 VRP (May 8, 2017) at 2; RCW 9A.44.073. The State limited the charging period to three years: July 2009 to July 2012. Clerk's Papers (CP) at 1. Even though there was considerable evidence that the abuse continued until Y.M. was 14 years old, the State elected not to add a charge of second degree rape. During trial, over Martinez's objection, Y.M.'s two friends, her mother, and a friend's mother were all permitted to testify that in 2014, Y.M. told them she had been sexually abused. 3 VRP (Oct. 30, 2017) at 435-36, 455; 3 VRP (Oct. 31, 2017) at 507-08. This was long after the charging period but still contemporaneous with the ongoing abuse. 1 VRP (Oct. 24, 2017) at 17-18; 2 VRP (Oct. 26, 2017) at 340-44.

Martinez moved to exclude Y.M.'s complaints to these witnesses as untimely since they happened so long after the charging period. 1 VRP (Oct. 24, 2017) at 18-19. The trial judge denied the motion, concluding that complaints are no longer required to be timely to be admissible. 2 VRP (Oct. 26, 2017) at 344. Based on those complaints, Y.M.'s testimony, and other evidence, the jury found Martinez guilty. CP at 35. Martinez received an indeterminate sentence of 123

3

months to life. *Id.* at 40. The Court of Appeals affirmed in an unpublished decision, holding that the trial court did err by finding that there is no timeliness requirement, but that the four complaints were timely since they were contemporaneous with the abuse. *State v. Martinez*, No. 77776-9-I, slip op. at 1, 7-8 (Wash. Ct. App. July 1, 2019) (unpublished), https://www.courts.wa.gov/opinions/pdf/777769.pdf. We granted review. *State v. Martinez*, 194 Wn.2d 1009 (2019).

ANALYSIS

At common law, victims of violent crimes were expected to raise an immediate "hue and cry" so their community could mount an immediate response. *State v. Hill*, 121 N.J. 150, 157, 578 A.2d 370 (1990) (quoting 2 SIR FREDERICK POLLOCK & FREDERIC WILLIAM MAITLAND, THE HISTORY OF ENGLISH LAW 578-79 (2d ed. 1923)). The failure to raise a hue and cry could be fatal to a future prosecution or civil action. Dawn M. DuBois, *A Matter of Time: Evidence of a Victim's Prompt Complaint in New York*, 53 BROOK. L. REV. 1087, 1089 (1988) (citing 4 JOHN HENRY WIGMORE, EVIDENCE §1135, at 298-306 nn.2-11 (Chadbourn rev. ed. 1972)).

The general requirement to raise a hue and cry was eliminated in the mid-1700's, but, because of deeply sexist expectations, it widely persisted in cases of alleged sexual violence. Kathryn M. Stanchi, *The Paradox of the Fresh Complaint*

4

*Rule*, 37 B.C. L. Rᴇᴠ. 441, 446 (1996) (citing *Hill*, 121 N.J. at 158). It continued to be applied in such cases under two general theories. First, an immediate outcry (or some other sort of immediate complaint) by the alleged victim was often required to be proved because courts were skeptical of victims' claims. *See, e.g.*, *Davis v. State*, 120 Ga. 433, 435, 48 S.E. 180 (1904) ("Without [a corroboration requirement], every man is in danger of being prosecuted and convicted on the testimony of a base woman, in whose testimony there is no truth."). Second, the fact the victim made an immediate complaint was often admitted to show that the victim had made a timely report of the assault when it otherwise would not have been able to do so under the Rules of Evidence. *State v. Murley*, 35 Wn.2d 233, 236-37, 212 P.2d 801 (1949). Without evidence of a timely report, juries might assume no assault occurred. *Hill*, 121 N.J. at 159 (citing *State v. Thomas*, 351 Mo. 804, 818, 174 S.W.2d 337 (1943)). We recognize that under either theory, the rule, like society, ignored some victims of sexual violence and treated others with unfortunate skepticism and demanded that they all behave in a like manner.[2]

---

[2] The fact of the complaint doctrine has come under serious and thoughtful criticism. *See, e.g.*, Kimberlé Crenshaw, *Mapping the Margins: Intersectionality, Identity Politics, and Violence Against Women of Color*, 43 Sᴛᴀɴ. L. Rᴇᴠ. 1241, 1247, 1251, 1270-71, 1279 (1991) (explaining the marginalization of immigrant women of color and Black women in contemporary feminist and antiracist discourses and its impact on antirape legislation and the allocation of community resources for rape victims). We recognize the complaint doctrine is predicated on myths about sexual violence and offers no help to many victims. Marital rape was not a crime until 1983 in our state. *See* Lᴀᴡs ᴏғ 1983, ch. 118. Until the 1970s, many states defined rape as a crime against a woman, ignoring male rape victims. *See* Jᴏᴇʟ Eᴘsᴛᴇɪɴ & Sᴛᴀᴄɪᴀ Lᴀɴɢᴇɴʙᴀʜɴ, U.S. Dᴇᴘ'ᴛ ᴏғ Jᴜsᴛɪᴄᴇ, Tʜᴇ Cʀɪᴍɪɴᴀʟ Jᴜsᴛɪᴄᴇ ᴀɴᴅ Cᴏᴍᴍᴜɴɪᴛʏ Rᴇsᴘᴏɴsᴇ ᴛᴏ Rᴀᴘᴇ, at 7-8 (1994),

The closely related "fresh complaint" doctrine evolved as a response to the common law requirement of hue and cry. *Hill*, 121 N.J. at 157. Eventually, the *requirement* that the prosecution prove a sexual assault victim made a timely hue and cry was replaced with the rule that the State could introduce such evidence in its case in chief to negate any inference that because the victim had failed to tell anyone she had been sexually assaulted, her later claim could not be believed.[3] *Id.* at 159; *State v. Kendricks*, 891 S.W.2d 597, 601 (Tenn. 1994) ("Because juries were allowed—sometimes even instructed—to draw negative inferences from the [victim's] failure to complain after an assault, . . . the [fact of the complaint doctrine] evolved as a means of counterbalancing these negative inferences." (citation omitted)).

Despite the doctrine's problematic roots, it still plays an important function because many jurors still subscribe to the myth that "real" victims report promptly. Beyond its original purpose to combat myths about female rape victims, the doctrine has evolved to include others, including children, men, and same-sex rape

---

available at https://www.ncjrs.gov/pdffiles1/Digitization/148064NCJRS.pdf [https://perma.cc/YNN2-WGVY] (describing how state rape statutes became gender-neutral beginning in the 1970s, recognizing the existence and seriousness of men as rape-victims). Enslaved women had no legal protection against rape and those in marginalized communities little more. Jill Elaine Hasday, *Federalism and the Family Reconstructed*, 45 UCLA L. REV. 1297, 1332 (1998). We recognize that the fact of the complaint doctrine offered these victims of sexual violence little if any help.

[3] The intent behind the rule was, in part, to protect victims against false jury beliefs. However, it was also intended to protect defendants against false rape claims, a false belief carried on from the original "hue and cry." *Hill,* 121 N. J. at 160.

6

victims. *See State v. Ragan*, 22 Wn. App. 591, 598, 593 P.2d 815 (1979) (where a 16-year-old male victim was raped by an adult male, the appellate court explained that it was proper to admit evidence of the victim's early complaint to prevent "the negative inference which otherwise would be properly drawn had the jury not known of the early complaint"); *State v. Ackerman*, 90 Wn. App. 477, 484-85, 953 P.2d 816 (1998) (where the defendant was convicted of molesting a 12-year old child, and the victim was unavailable to testify, the appellate court held that the victim's statements were properly admitted under the fact of the complaint doctrine). The majority of states continue to apply the doctrine. Dale Joseph Gilsinger, Annotation, *Application of Common-Law "Fresh Complaint" Doctrine as to Admissibility of Alleged Victim's Disclosure of Sexual Offense– Post-1950 Cases*, 39 A.L.R.6th, tbl. of cases, laws & rules at 267-76 (2008), § 3.5, at 13 (Supp. 2020). In Washington, the State may present evidence that the victim reported the sexual violence to someone as part of its case in chief. *State v. Ferguson*, 100 Wn.2d 131, 135, 667 P.2d 68 (1983) (citing *State v. Goebel*, 40 Wn.2d 18, 25, 240 P.2d 251 (1952), *overruled in part on other grounds by State v. Lough*, 125 Wn.2d 847, 889 P.2d 487 (1995)). The evidence admissible under the doctrine is limited. Testimony under the doctrine is not admissible for the truth of the matter asserted, only to demonstrate that the victim reported to someone. *State v. Stewart*, 52 Wash. 61, 63, 100 P. 153 (1909). Witnesses may give sufficient

details "to identify the nature of the offense of which complaint was made," but details such as identity of the perpetrator are not admissible. *Goebel*, 40 Wn.2d at 25.

Martinez essentially argues that *Ferguson* and *Goebel* are no longer good law because they are inconsistent with our hearsay rules and are harmful because they perpetuate myths about the victims of sexual violence. *See* Suppl. Br. of Pet'r at 10-12. We will not overturn prior published opinions unless "'an established rule is incorrect and harmful,'" or "the legal underpinnings of the precedent have been eroded." *Pendergrast v. Matichuk*, 186 Wn.2d 556, 565, 379 P.3d 96 (2016) (quoting *In re Rights to Waters of Stranger Creek,* 77 Wn.2d 649, 653, 466 P.2d 508 (1970), and citing *W.G. Clark Constr. Co. v. Pac. Nw. Reg'l Council of Carpenters*, 180 Wn.2d 54, 66, 322 P.3d 1207 (2014)). Martinez has not shown that either case is incorrect and harmful, or that their legal underpinnings have eroded. As another high court noted recently, "there is no well developed body of scientific research suggesting that these long-standing biases [against victims who do not make timely reports] have been entirely eliminated." *State v. Daniel W.E.*, 322 Conn. 593, 618, 142 A.3d 265 (2016). While society has arguably developed a greater understanding that sexual assault victims often do not report their experience, many jurors still mistakenly believe myths about how victims should act after they are assaulted. *See, e.g.*, *Hill*, 121 N.J. at 164 (noting that while "the

8

fresh-complaint rule does not necessarily contradict sexist notions . . . our judicial process cannot remove from every juror all subtle biases or illogical views of the world"); *Commonwealth v. King*, 445 Mass. 217, 230, 834 N.E.2d 1175 (2005) (holding that the fresh complaint doctrine should now be seen as a way to mitigate juror bias because "jurors continue to be skeptical of allegations of rape").

"We are mindful that in some cases efforts to rid the judicial process of sexism by unreasoned reform have proven in practice to be worse medicine than the illness itself." *Hill*, 121 N.J. at 164-65 (citing SUSAN ESTRICH, REAL RAPE 81-83 (1987); Janet E. Findlater, *Reexamining the Law of Rape*, 86 MICH. L. REV. 1356, 1356-57 (1988)). But we reject the suggestion that retaining the rule in its modern form amounts to endorsing the misogynistic myths that the rule evolved from. The fact of the complaint is necessary in current jurisprudence because mistaken beliefs about sexual violence are still pervasive in our society and in our jury boxes. *See generally*, Kathryn M. Stanchi, *The Paradox of the Fresh Complaint Rule*, 37 B.C. L. REV. 441, 448-49 (1996). "The fresh-complaint rule responds to those jurors on their own terms." *Hill*, 121 N.J. at 164. Meeting jurors where they are "serves to neutralize the sexist expectations of some jurors," which

can be particularly important in cases where there is little physical evidence or the victim's credibility suffers due to other stereotypes or biases. *Id.*

We recognize that the fact of the complaint doctrine is inconsistent with the hearsay rules. But the rule is long standing, has been recognized since the hearsay rules were codified, and provides an important supplement to those rules. "A special rule that restores the credibility of sexual assault complainants is not only practical and analytically justifiable, but also necessary" because of persisting cultural stereotypes and bias, both explicit and implicit. Stanchi, *supra*, at 477. Under our evidence rules, prior consistent statements may be used only when a witness's credibility has been attacked. ER 801(d)(1). But because of the nature of sexual assault cases, where there is often little to no physical evidence, it is vital to have a preemptive tool. *Hill*, 121 N.J. at 164.[4] In many cases, a defendant need not explicitly or impliedly attack the victim's credibility—juror bias based on widespread mistaken beliefs about sexual assault and sexual assault victims has already called the victim's credibility into question.[5]

Martinez has not established we should overrule *Ferguson* and *Goebel.* We decline to do so. Because the fact of the complaint doctrine protects victims and

---

[4] "[A]dmission of fresh complaint evidence under rules of evidence . . . ignores and obscures the reality that sexual assault complainants face unique obstacles to just adjudication of their cases." Stanchi, *supra*, at 472.

[5] Despite widespread belief that sexual assaults are committed by strangers, the vast majority of sexual assaults are committed by someone the victim knows. Shawn E. Fields, *Debunking the*

provides an important supplement to the current rules of evidence, we decline to

abandon the doctrine.

REMAINING ISSUES

Martinez also argues that even under the fact of the complaint doctrine, the

reports by Y.M. were not timely because they were made after the charging period

ended. *See* Pet. for Rev. at 8. We review a judge's decision to admit evidence for

abuse of discretion. *State v. Wilson*, 60 Wn. App. 887, 890, 808 P.2d 754 (1991)

(citing *State v. Jones*, 95 Wn.2d 616, 628, 628 P.2d 472 (1981)). Martinez offers

no authority that establishes reports must be made within the charging period. The

doctrine merely requires that "the complaint was timely made." *Ferguson*, 100

---

*Stranger-in-the-Bushes Myth: The Case for Sexual Assault Protection Orders*, 2017 WIS. L. REV. 429, 433 (2017) (citing Perpetrators of Sexual Violence: Statistics, RAINN [https://perma.cc/FUL8-33TB] ("7 out of 10 rapes are committed by someone known to the victim.")). When sexual assault is committed by someone the victim knows or even lives with, the sort of physical evidence many jurors want is often not available. "Post-verdict interviews often confirm that jurors simply do not believe victims absent clear signs of physically forcible rape coupled with a victim taking immediate legal action against her assailant." *Id.* at 434 (citing Louise Ellison & Vanessa E. Munro, *A Stranger in the Bushes, or an Elephant in the Room? Critical Reflections Upon Received Rape Myth Wisdom in the Context of a Mock Jury Study*, 13 NEW CRIM. L. REV. 781, 784 (2010)). But physical force is rarely used by those who sexually abuse children. WORLD HEALTH ORGANIZATION, GUIDELINES FOR MEDICO-LEGAL CARE FOR VICTIMS OF SEXUAL VIOLENCE 76 (2003), available at https://apps.who.int/iris/bitstream/handle/10665/42788/924154628X.pdf?sequence=1 [https://perma.cc/46WL-YETA]. Victims face immense barriers in pursuing a case, even if they report the assault to police. "[O]ut of every 1,000 rapes, 994 perpetrators will walk free, 310 are reported to police, 57 lead to arrest, 11 cases get referred to prosecutors, 7 cases will lead to a felony conviction, and only 6 rapists will be incarcerated." Olabisi Adurasola Alabi, *Sexual Violence Laws Redefined in the "Me Too" Era: Affirmative Consent & Statutes of Limitations*, 25 WIDENER L. REV. 69, 70 (2019) (citing The Criminal Justice System: Statistics, RAINN, https://www.rainn.org/statistics/criminal-justice-system (statistics from Dec 18, 2018)).

11

Wn.2d at 135-36. A complaint is timely if it is made when there is an

"'opportunity to complain.'" *State v. Griffin*, 43 Wash. 591, 597, 86 P. 951 (1906)

(quoting 4 WILLIAM BLACKSTONE, COMMENTARIES *213). Here, Y.M. reported

the sexual abuse while it was ongoing, despite living with her abuser parent. We

leave it in the able hands of the trial court to determine what constitutes a timely

complaint based on the surrounding circumstances. *See Griffin*, 43 Wash. at 598-

99 (considering the circumstances surrounding delay of a complaint, including lack

of threat and opportunities to complain); *see also Murley*, 35 Wn.2d at 237

(allowing details to "establish whether or not a complaint was made timely"); *State*

*v. Graham*, 59 Wn. App. 418, 424-25, 798 P.2d 314 (1990) (upholding the

admission of expert testimony explaining how often and why child victims wait to

report abuse); *Wilson*, 60 Wn. App. at 890 (upholding admission of evidence of

prior assaults to explain why the victim had waited to report). Trial judges have

discretion to admit evidence explaining why a victim waited to report facts of

sexual violence, and other circumstances, in deciding whether or not to admit fact

of the complaint testimony. Child abuse is not a set of multiple discrete acts, it is

an ongoing pattern and practice. *See* Rebecca L. Thomas, Notes, *Adult Survivors*

*of Childhood Sexual Abuse and Statutes of Limitations: A Call For Legislative*

*Action*, 26 WAKE FOREST L. REV. 1245, 1254 (1991) (citing Frederick H. Lindberg

& Lois J. Distad, *Post-Traumatic Stress Disorders in Women Who Experienced*

*Childhood Incest*, 9 CHILD ABUSE & NEGLECT 329, 330 (1985)). Because the abuse was reported while the abuse was still ongoing, we find no abuse of discretion in admitting the statements based on timeliness.

Martinez also argues that the trial judge erred in allowing four witnesses to testify regarding Y.M.'s complaints. *See* Suppl. Br. of Pet'r at 2. We review a judge's decision to admit evidence for abuse of discretion. *Wilson*, 60 Wn. App. at 890 (citing *Jones*, 95 Wn.2d at 628). Martinez relies on *Commonwealth v. Arana*, where the Massachusetts Supreme Court found error in admitting testimony by three witnesses under the fact of the complaint doctrine. 453 Mass. 214, 223, 901 N.E.2d 99 (2009). But Massachusetts's fact of the complaint doctrine differs from ours—under Massachusetts law, only one witness is allowed to testify about the fact of the complaint. *Id.* at 220 (citing *Commonwealth v. Murungu*, 450 Mass. 441, 455-46, 879 N.E.2d 99 (2008)). Washington has no such rule. Martinez does not establish the trial court abused its discretion in allowing four witnesses to testify.

Finally, Martinez argues that the court "compounded the unfair prejudice" by failing to give a jury instruction on the fact of the complaint evidence. Suppl. Br. of Pet'r at 18. But Martinez did not request such an instruction so any error was not preserved. *See* RAP 2.5(a). Regardless, we find no error in failing to give an unrequested instruction. *See, e.g.*, *City of Seattle v. Love*, 61 Wn.2d 113, 114,

377 P.2d 255 (1962) (the court's failure to instruct the jury in the absence of a request to do so is not error) (citing *State v. Goldstein*, 58 Wn.2d 155, 361 P.2d 639 (1961); *State v. Ross*, 85 Wash. 218, 147 P. 1149 (1915)).

CONCLUSION

Martinez has not shown that *Ferguson* and *Goebel* are incorrect and harmful, or that the basis for those opinions has been eroded. Nor has he established reversible error. Accordingly, we affirm.

_____
González, J.

WE CONCUR:

Stephens, C.J.

Johnson, J.                                    Yu, J.

Madsen, J.                                    Montoya-Lewis, J.

Owens, J.                                     Whitener, J.

No. 97496-9

GORDON McCLOUD, J. (dissenting)—The majority clearly understands that the "hue and cry" doctrine is based on a myth—the myth "that a female naturally complains promptly of offensive sex liberties upon her person." *State v. Murley*, 35 Wn.2d 233, 237, 212 P.2d 801 (1949). But it maintains this doctrine anyway. It does so in the hope that it will combat widespread juror prejudices against rape victims.

I disagree with this approach. I would not retain one false and prejudicial myth (that female rape victims always raise a timely hue and cry) to combat another false and prejudicial myth (that rape victims cannot be trusted). That path poses several problems: it perpetuates the rape myth, it adds a judicially created exception to the rule against hearsay despite the fact that the Rules of Evidence (ERs) contain an exclusive list of exceptions, and it results in a blanket rule allowing admission of those out-of-court statements without any of the indicia of reliability that the enacted ERs demand of all other exceptions to the rule against hearsay.

1

I therefore respectfully dissent.  I would deal with the problem that the majority and I both recognize by applying our ERs, allowing the State to make its case as it must in every other criminal prosecution, and crafting appropriate voir dire questions and jury instructions to combat the false beliefs.

I. THE HUE AND CRY DOCTRINE REFLECTS A LONG HISTORY OF PREJUDICE AND PROBLEMATIC, INACCURATE ASSUMPTIONS ABOUT RAPE VICTIMS

I agree with the majority about the deeply flawed origins of our current "hue and cry" or "fact of complaint" doctrine.  Majority at 5-7.  In feudal England, "the evidence . . . indicates that rape was not publicly prosecuted at all, that maintaining an appeal was difficult, and that maintaining it to penalty was very unlikely."  Roger D. Groot, *The Crime of Rape* temp. *Richard I and John*, 9 J. LEGAL HIST. 324, 330 (1988).  Any remedy "depend[ed] more on the power of the victim than the quality of the event," rendering the "least powerful[] those most likely to be victimized in the first instance, [and] also the least likely to obtain any redress."  *Id.*  Henry de Bracton, a 13th century legal scholar, reasoned that when "a virgin has been so deflowered and overpowered" she should "hue and cry" "whilst the act is fresh" and show "honest men the injury done to her, the blood and her dress stained with blood, and the tearing of her dress."  2 HENRICI DE BRACTON, DE LEGIBUS ET CONSUETUDINIBUS ANGLIAE 483 (Sir Travers Twiss ed., trans., 1879).  "Rape" at that time meant the violent rape of a virgin woman.  *See State v. Hill*,

121 N.J. 150, 158, 578 A.2d 370 (1990) (noting the exclusion of many women, including "women who were not virgins" and "women who did not sustain bloody physical injuries").

This feudal legal doctrine based on the hue and cry myth was nevertheless incorporated into the law in this country. But it was never a myth that was applied equally to all rape victims. Specifically, the law provided no protection at all to most nonwhite rape victims—not even a timely hue and cry would provide a legal remedy for Native American or enslaved women for much of this country's history. *See* SUSAN BROWNMILLER, AGAINST OUR WILL: MEN, WOMEN AND RAPE 140, 151-53 (1975); Jill Elaine Hasday, *Federalism and the Family Reconstructed*, 45 UCLA L. REV. 1297, 1332-33 (1998) ("Slaves had no legal protection against rape, and slave women were sold into concubinage or prostitution at 'fancy girl' markets devoted specifically to that purpose." (footnote omitted)). And of course the hue and cry doctrine was never applied to male rape victims. In fact, sexual violence against males was not even covered by early rape laws.[1]

---

[1] "In the United Kingdom rape is a crime against women specifying forced penile penetration of the vagina. . . . Male rape cannot occur within these strict legal terms." Gillian Mezey & Michael King, *Male Victims of Sexual Assault*, 27 MED. SCI. & L. 122 (1987). In the United States, "[r]ape, at common law, *is unlawful carnal knowledge of a woman by force and against her will*." NAT'L INST. OF LAW ENF'T & CRIMINAL JUSTICE, U.S. DEP'T OF JUSTICE, FORCIBLE RAPE: AN ANALYSIS OF LEGAL ISSUES at 5 (Mar. 1978). At the time the cited book was written, in 1978, "many states ha[d] made the crime sex-neutral" and stopped presuming "male

For the limited category of women to whom the doctrine did apply, the hue

and cry requirement provided little comfort. It was part of a criminal justice

system that historically treated women with skepticism and imposed barriers

unique to rape allegations. *See generally* Michelle J. Anderson, *The Legacy of the*

*Prompt Complaint Requirement, Corroboration Requirement, and Cautionary*

*Instructions on Campus Sexual Assault*, 84 B.U. L. REV. 945 (2004). Those

barriers gave men accused of rape "special legal protection beyond that which the

law affords defendants accused of other crimes" because they feared false

accusations by women against men. *Id.* at 1022. This is an age-old fear.

Seventeenth century legal scholar Sir Matthew Hale summed up the sentiment of

his time: rape "is an accusation easily to be made and hard to be proved, and harder

to be defended by the party accused, tho never so innocent." 1 MATTHEW HALE,

THE HISTORY OF THE PLEAS OF THE CROWN 635 (1736).

Then, at some point, the hue and cry doctrine changed from a rule *requiring*

the prosecution to prove a timely hue and cry as an element of its rape case, to a

rule *allowing* the prosecution to bolster its case with timely hue and cry hearsay

evidence to prove the truth of the matter asserted. The rationale for the rule,

though, remained the same: that the testimony of a female rape victim is

---

perpetrators and female victims." *Id.* at 7, 13 (citing Michigan, Washington, and
Wisconsin statutes as specific examples).

4

inherently suspect and, hence, required a special rule to treat such testimony as presumptively under attack and in need of special bolstering.

In Washington, we first used this rationale to uphold admission of such hearsay evidence not long after statehood. *State v. Hunter*, 18 Wash. 670, 672, 52 P. 247 (1898) ("[W]e think the better rule is to restrict the evidence to the fact of complaint, and that anything beyond that is hearsay of the most dangerous character."). We upheld the trial court's decision to admit the fact that the complaint was made, but we ruled that the trial court must exclude the name of the accused and other specifics. *State v. Griffin*, 43 Wash. 591, 594-95, 86 P. 951 (1906). We also held that the complaint could be admitted only if it were timely made. *State v. Ferguson*, 100 Wn.2d 131, 135-36, 667 P.2d 68 (1983). We used the same rationale to justify this version of the hue and cry doctrine as the rationale used eight centuries ago: "a female naturally complains promptly of offensive sex liberties upon her person." *Murley*, 35 Wn.2d at 237.

In fact, we explicitly quoted Blackstone and endorsed his false and unfounded assumption about who was a believable complainant:

> "If the witness be of good fame; if she presently discovered the offense, and made search for the offender; if the party accused fled for it; these and the like are concurring circumstances which give greater probability to her evidence. But, on the other side, if she be of evil fame, and stand unsupported by others; *if she concealed the injury for any considerable time after she had opportunity to complain*; if the

5

place where the fact was alleged to be committed, was where it was possible she might have been heard, and she made no outcry; *these and the like circumstances carry a strong, but not conclusive, presumption that her testimony is false or feigned*."

*Griffin*, 43 Wash. at 597-98 (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES *213) (emphasis added).

We now know that the historic assumption that a woman will "hue and cry" promptly has no basis in reality. Child victims—like the victim in this case—frequently delay reporting sexual abuse out of "fear of the perpetrator, love and respect for a family or friend perpetrator, and fear that they will not be believed." Kathryn M. Stanchi, *The Paradox of the Fresh Complaint Rule*, 37 B.C. L. REV. 441, 460 (1996). Adults may delay "because they fear no one will believe them, or because they feel embarrassed or guilty about the sexual assault." *Id.* at 459-60. Some victims remain silent forever: as the majority recognizes, only 310 out of 1,000 rapes are even reported to police.[2]

Thus, the hue and cry rule stems from false assumptions about how "real" rape victims behave. All nine justices agree on this point. The question is what to do about that: maintain the hue and cry exception to the ERs as the *only* common

---

[2] Majority at 10 n.5 (quoting Olabisi Adurasola Alabi, *Sexual Violence Laws Redefined in the "Me Too" Era: Affirmative Consent & Statutes of Limitations*, 25 WIDENER L. REV. 69, 70 (2019) (citing The Criminal Justice System: Statistics, RAINN, https://www.rainn.org/statistics/criminal-justice-system (statistics from Dec. 18, 2018))).

law hearsay exception among an otherwise exclusive list of officially enacted exceptions, as the majority does, or subject these out-of-court statements to the same rigorous reliability tests that our evidence rules apply to all other out-of-court statements offered for the truth of the matter asserted in all other prosecutions.

I choose the latter path as the one that more fully protects the dignity of the complainant and the reliability of the process.

II.     WE SHOULD DISCARD THIS ANTIQUATED COMMON LAW DOCTRINE AND ENFORCE THE ERS TO MORE FULLY PROTECT THE DIGNITY OF COMPLAINANTS AND THE RELIABILITY OF THE PROCESS

A. *The ERs Exclude Hearsay with Some Explicitly Listed Exceptions; a Hue and Cry Exception Is Not among Them*

The majority acknowledges that the hue and cry rule is separate from any enumerated hearsay exception and is "inconsistent with the hearsay rules." Majority at 9. But it does not recognize the importance of this fact:  it is important because the list of exceptions to the rule against hearsay was designed to be exclusive.

"Relevant testimony may be excluded from trial if it is hearsay," defined as "'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'" *State v. Garcia*, 179 Wn.2d 828, 845, 318 P.3d 266 (2014) (quoting ER 801(c)).

7

"In general, the testimony of a witness cannot be bolstered by showing that the witness has made prior, out-of-court statements similar to and in harmony with his or her present testimony on the stand." *Thomas v. French*, 99 Wn.2d 95, 103, 659 P.2d 1097 (1983) (citing *Sweazey v. Valley Transp., Inc.*, 6 Wn.2d 324, 332, 107 P.2d 567, 111 P.2d 1010 (1940)). We bar such bolstering because "[r]epetition generally is not a valid test of veracity." *State v. Purdom*, 106 Wn.2d 745, 750, 725 P.2d 622 (1986) (citing *State v. Harper*, 35 Wn. App. 855, 670 P.2d 296 (1983)). The emphasis at trial should be on in-court, not out-of-court, statements. *Tome v. United States*, 513 U.S. 150, 165, 115 S. Ct. 696, 130 L. Ed. 2d 574 (1995).

But we long ago recognized a single common law exception to this antibolstering rule: out-of-court statements were admissible to rebut charges of "recent fabrication." *Murley*, 35 Wn.2d at 238. Under that exception, a witness's prior consistent statements could be admitted *after* the witness's testimony had been attacked as recently fabricated. *Id.* The prior consistent statements were admissible for only a limited purpose: "for the sole purpose of re-establishing the witness' credibility." *Id.*

This court consciously included and expanded this exception when we drafted our modern ERs: we made such prior consistent statements admissible for

the truth of the matter asserted as well.  ER 801(d)(1)(ii) (providing for

admissibility of prior consistent statements "to rebut an express or implied charge

against the declarant of recent fabrication or improper influence or motive");

Comment to ER 801(d)(1)(ii), 91 Wn.2d at 1163 (comment to evidence rules

noting that the rule makes statements "admissible as substantive evidence which

were previously admissible only to rehabilitate an impeached witness").

That should be the end of our inquiry.  Under the evidence rules enacted by

this court, "[h]earsay is not admissible except as provided by these rules, by other

court rules, or by statute."  ER 802.  In addition to statements defined as

nonhearsay under ER 801, our rules provide 26 distinct hearsay exceptions

available for different reasons in different contexts.  ER 803(a), 804(b).  The hue

and cry exception is not one of them.  Under the rule of expressio unius est

exclusio alterius, we interpret that detailed list to be exclusive.  *In re Det. of Lewis*,

163 Wn.2d 188, 196, 177 P.3d 708 (2008) (quoting *Landmark Dev., Inc. v. City of*

*Roy*, 138 Wn.2d 561, 571, 980 P.2d 1234 (1999) (quoting *Wash. Nat. Gas Co. v.*

*Pub. Util. Dist. No. 1 of Snohomish County*, 77 Wn.2d 94, 98, 459 P.2d 663

(1969))).

Further, unlike the drafters of the federal rules, the drafters of our State

evidence rules "decided not to adopt any catch-all" hearsay exception to avoid a

"lack of uniformity which would make preparation for trial difficult." Comment to ER 803(b), 91 Wn.2d at 1171. We sought to avoid "doubt whether an affirmance of an admission of evidence under the catch-all provision amounted to the creation of a new exception with the force of precedent or merely a refusal to rule that the trial court had abused its discretion." *Id.* This decision bolsters the conclusion that the ER's list of exceptions to the hearsay rule is exclusive.

Hue and cry is not the only common law evidence rule that we abandoned when we adopted formal evidence rules, so we can't assume it was abandoned by accident. For example, the "res gestae" doctrine, dating back to early statehood, *see State v. Freidrich*, 4 Wash. 204, 214, 29 P. 1055 (1892); *State v. Smith*, 26 Wash. 354, 67 P. 70 (1901), is also missing from our evidence rules. We adopted a few specific and separately listed exceptions in place of that res gestae doctrine; it "evolved into several present day hearsay exceptions, usually identified as the present sense impression, the excited utterance, and statements of present bodily condition, mental states, and emotions." *State v. Pugh*, 167 Wn.2d 825, 839-40, 225 P.3d 892 (2009) (citing 2 KENNETH S. BROUN, MCCORMICK ON EVIDENCE § 268, at 245-46 (6th ed. 2006)). Thus, it cannot be argued that the rule drafters simply missed the hue and cry doctrine because they were ignoring prior common

law.  Instead, once again, their decision to exclude it should be considered

intentional and based on the purposes of the evidence rules.

Finally, since 1979, we made these evidence rules "govern proceedings in

the courts of the state of Washington" (with specific exceptions inapplicable here).

ER 101, 1101; *see also In re Det. of Lane*, 182 Wn. App. 848, 855, 332 P.3d 1042

(2014) ("ER 101 conveys the plain message that the Rules of Evidence will apply

in all court proceedings in Washington unless an exception is stated in ER

1101.").[3]  If we, the court, thought that the hue and cry doctrine was reliable

enough to be a hearsay exception, we could have put it in the rules themselves.

To be sure, our court has discussed the hue and cry doctrine even after we

adopted the evidence rules.  *Ferguson*, 100 Wn.2d 131; *see also Pugh*, 167 Wn.2d

at 842 (comparing the pre-evidence rules version of hue and cry doctrine with "res

gestae" evidence).  But *Ferguson* did not address the postrule legitimacy of the

doctrine itself.  Instead, defendant/petitioner Ferguson seems to have assumed that

---

[3] The legislature may certainly craft exceptions from and additions to the evidence rules.  *See State v. Monson*, 113 Wn.2d 833, 838-39, 784 P.2d 485 (1989).  For example, in 1984, the Court of Appeals questioned whether a statutory "codification of the public records exception to the hearsay rule" remained "valid following the adoption of the evidence rules," which lacked such an exemption. *Id.* at 838 (citing *State v. Dibley*, 38 Wn. App. 824, 828 n.4, 691 P.2d 209 (1984)).  The answer was that the statutory exemption certainly remained valid:  ER 803(a)(8) and its comment "show[ed] that the reason the federal public records hearsay exception was not adopted [in Washington] was because the [Washington] statute already provided for the exception." *Id.* at 839.  No such statute codifying the hue and cry or fact of complaint rule exists.

11

the doctrine remained valid and argued instead that the trial court had erred by admitting details of the complaint in addition to the fact that it was made. *Id.* at 135-36. In other words, that case was about whether the hue and cry rule had been applied correctly—not about whether the hue and cry rule survived the ERs. *Id.* Martinez raises that argument for the first time since the adoption of the ERs.

### B. Our Evidence Rules Exclude Hearsay Due to Its Unreliability; Hue and Cry Hearsay Is Not Exempt from This Problem

The majority reasons that given "the nature of sexual assault cases, where there is often little to no physical evidence," admission of "hue and cry" hearsay evidence is "vital [as] a preemptive tool." Majority at 10.

This conclusion does not address the potential problem with most out-of-court statements, though: their lack of reliability. *See, e.g., Purdom*, 106 Wn.2d at 750 ("Repetition generally is not a valid test of veracity." (citing *Harper*, 35 Wn. App. 855)). Relevance alone does not answer this question, either: "That certain out-of-court statements may be relevant does not dispose of the question whether they are admissible." *Tome*, 513 U.S. at 164. The hue and cry rule continues to allow the court to admit out-of-court statements, for the truth of the matter asserted, without a general determination by the rules or an individual determination by the trial court that the statements are reliable.

12

This undermines the very reason for a duly enacted set of evidence rules. Those rules exist so "that the truth may be ascertained and proceedings justly determined." ER 102. A relaxation of the hearsay rules would surely aid the prosecution's ability to obtain a conviction in any case in which credibility was key and physical evidence was lacking. But the rules prohibit hearsay because unsworn, out-of-court statements are inherently unreliable. Nothing about the majority's opinion suggests that Y.M.'s statements, or complaints of sexual assault generally, are more reliable than any other out-of-court statement. Instead, the general rule concerning reliable evidence should apply: juries make their decision based on *in-court* testimony. *See Tome*, 513 U.S. at 165; *United States v. Salerno*, 505 U.S. 317, 322, 112 S. Ct. 2503, 120 L. Ed. 2d 255 (1992) (Courts should not "alter evidentiary rules merely because litigants might prefer different rules in a particular class of cases.").

### C. Other States Have Abolished or Modified the Doctrine

Different states have acknowledged some of these problems and taken different approaches to addressing them. Almost 20 years ago, the Tennessee Supreme Court recognized that the doctrine had its "genesis in the profoundly sexist expectation that female victims of sexual crimes should respond in a prescribed manner or risk losing credibility." *State v. Kendricks*, 891 S.W.2d 597,

604 (Tenn. 1994). Similarly, New Jersey's Supreme Court has recognized that the doctrine is based on a "pseudo-Freudian analysis of the ways a 'normal' woman would react to sex and to rape." *Hill*, 121 N.J. at 162.

Tennessee then abolished the doctrine as applied to children—like the child victim in this case—because "unlike the presumptions regarding adult victims, juries do not necessarily presume that children fabricate, nor do they presume that a child will complain immediately." *State v. Livingston*, 907 S.W.2d 392, 395 (Tenn. 1995). Massachusetts limited testimony "to that of one witness—the first person told of the assault" so as to "accomplish the primary goal of the doctrine" while avoiding excessive prejudice. *Commonwealth v. King*, 445 Mass. 217, 242-43, 834 N.E.2d 1175 (2005). California and Vermont chose to admit complaints for limited nonhearsay purposes, in accordance with their respective rules of evidence. *People v. Brown*, 8 Cal. 4th 746, 760-61, 883 P.2d 949, 35 Cal. Rptr. 2d 407 (1994) (characterizing "complaint" of a crime as nonhearsay conduct); *State v. Madigan*, 2015 VT 59, ¶ 28, 99 Vt. 211, 228-29, 122 A.3d 517 (2015) (rejecting "the 'fresh-complaint rule' as an independent evidentiary doctrine because the doctrine has been largely supplanted by rules of evidence" but noting that that

evidence "is often, though not always, admissible under our modern rules of evidence").[4]

We should follow the guidance of these states to seek solutions other than upholding the hue and cry rule in its current form. I would take the clear and direct path that California and Vermont chose and apply our duly enacted ERs—as we do in all other situations. That would mean that a timely complaint of rape would be admissible as substantive evidence to rebut express or implied charges of recent fabrication. ER 801(d)(1)(ii). It could also be admissible as an excited utterance, ER 803(a)(2), a statement for purposes of medical treatment, ER 803(a)(4), a statement of present mental state, ER 803(a)(1), etc. But all such admissibility decisions would have to be based on an individual finding that it satisfied one of those exceptions—exceptions that must be applied to every other out-of-court statement offered for the truth of the matter asserted in every other serious violent criminal case.

### D. There Are Other Ways To Deal with Juror Prejudices

The majority acknowledges that this rule "evolved from" "misogynistic myths" but maintains it to "[m]eet[] jurors where they are." Majority at 8-9.

---

[4] And, as the majority recognizes, some states have maintained a "fact of complaint" rule. *See, e.g.*, *State v. Daniel W.E.*, 322 Conn. 593, 618, 142 A.3d 265 (2016); *Hill*, 121 N.J. 150.

I agree that combating juror prejudice presents the most compelling reason
for keeping the rule.[5] False assumptions about sexual assault victims are surely
widespread. And jurors, as a cross section of the community, may believe the false
assumptions that gave rise to the hue and cry doctrine in the first place. But an
unwritten common law hearsay exception—one not even premised on the
reliability of the admitted out-of-court statements—is not the answer: two wrongs
don't make a right.

Creating a rule that allows admission of potentially unreliable evidence in
order to counteract juror prejudice also sets a dangerous precedent for dealing with
other juror prejudices. Certainly, "[i]ndividual jurors bring to their deliberations
'qualities of human nature and varieties of human experience, the range of which is
unknown and perhaps unknowable.'" *McCleskey v. Kemp*, 481 U.S. 279, 311, 107
S. Ct. 1756, 95 L. Ed. 2d 262 (1987) (quoting *Peters v. Kiff*, 407 U.S. 493, 503, 92
S. Ct. 2163, 33 L. Ed. 2d 83 (1972) (lead opinion of Marshall, J.)). And those
qualities likely include prejudice—the same sorts of prejudice that attorneys,

---

[5] I don't necessarily agree that such prejudice existed here. The victim in this case
was a child. The State has neither argued nor shown that the general public believes the
hue and cry myths when it comes to children. And the cases suggest that they do not.
*See Livingston*, 907 S.W.2d at 395 ("[U]nlike the presumptions regarding adult victims,
juries do not necessarily presume that children fabricate, nor do they presume that a child
will complain immediately."); *Brown*, 8 Cal. 4th at 758 ("Child victims, in particular,
commonly are reluctant to report such incidents and delay in doing so, or fail to provide a
full report.").

litigants, and we judges bring to our decision-making, whether we realize it or not. But we don't counteract those prejudices with offsetting prejudices or supposedly offsetting unreliable, nonscientific data. Doing that would lead to even more unreliable decisions.

Instead, we have adopted other cautionary tactics (though certainly with less than perfect results). Still, I would apply those cautionary tactics that are clearly permissible and pose no unreliability problems, such as a robust voir dire process, introductory juror videos, and detailed jury instructions.[6] Voir dire, in particular, "is necessary to discover bias in prospective jurors and to assist the trial court in its responsibility to remove prospective jurors who will not be able to follow its instructions on the law." *State v. Davis*, 141 Wn.2d 798, 825-26, 10 P.3d 977 (2000). As Justice Marshall explained in the context of racial prejudice, "[g]iven the history and continuing legacy of racism in our country," it was "not at all 'inconceivable' that the *voir dire* process" where a defendant is accused of "an interracial sexual attack and murder" could "have legitimately extended over six weeks" to "obtain a fair and impartial jury." *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 521-22, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984) (Marshall, J., concurring in the judgment). The same extension of juror questioning would be

---

[6] In this case, no party proposed any cautionary jury instructions regarding prejudice against Y.M.'s testimony.

17

appropriate where, as here, the history and continuing legacy of prejudice against rape complainants is at issue.

III.    ADMITTING Y.M.'S HEARSAY STATEMENTS WAS NOT HARMLESS

Erroneous evidentiary rulings require reversal and a new trial when "'within reasonable probabilities, had the error not occurred, the outcome of the trial would probably have been materially affected.'" *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986) (quoting *State v. Cunningham*, 93 Wn.2d 823, 831, 613 P.2d 1139 (1980)).

The trial court allowed the State to present the facts of not one, not two, but four hearsay complaints. Day after day, the jury heard from numerous witnesses that Y.M. previously reported that she "had been raped," 3 Verbatim Report of Proceedings (VRP) (Oct. 30, 2017) at 436, that "she had been being abused and that she didn't want to go home," *id.* at 455, that she "was molested and raped," 3 VRP (Oct. 31, 2017) at 508, that she "was raped," 4 VRP (Oct. 31, 2017) at 615, that she had "been raped," 4 VRP (Nov. 1, 2017) at 740, and that her father had "been raping her," *id.* at 742.

Within reasonable probabilities, Y.M.'s out-of-court statements materially affected the outcome of the trial. The State's entire case revolved around the credibility of Y.M.'s testimony. The State used the out-of-court statements about

how Y.M. had repeated her allegations as substantive evidence to bolster her credibility. It then argued in closing that the fact that Y.M. "told people what happened to her repeatedly" meant she was credible. 5 VRP (Nov. 6, 2017) at 828.

But as stated above, "[r]epetition generally is not a valid test of veracity." *Purdom*, 106 Wn.2d at 750 (citing *Harper*, 35 Wn. App. 855). The erroneous admission of these statements likely affected the outcome of the trial and Martinez's conviction should be reversed.

CONCLUSION

"When the prosecution of rape incorporates rape myths, it promotes sex discrimination and undermines women's confidence in the legal system." Morrison Torrey, *When Will We Be Believed? Rape Myths and the Idea of a Fair Trial in Rape Prosecutions*, 24 U.C. DAVIS L. REV. 1013, 1060 (1991).

The hue and cry doctrine incorporates ancient rape myths into modern legal doctrine and allows the jury to consider potentially unreliable out-of-court statements for the truth of the matter asserted. I would condemn the hue and cry exception to the rule against hearsay, hold that Y.M.'s out-of-court statements were inadmissible hearsay, reverse Martinez's conviction, and remand for a new trial.

Gordon McCloud, J.

20