IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>                Respondent,<br><br>        v.<br><br>WILLIAM MATTHEW HELKENN III,<br><br>                Appellant. | No. 86166-2-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, A.C.J. — A jury convicted William Helkenn of one count of child molestation in the first degree and one count of child molestation in the third degree. He assigns error to several rulings of the trial court, largely regarding evidentiary issues. Although we conclude that the trial court committed two errors, both were harmless and the cumulative error doctrine does not entitle Helkenn to relief. We affirm the conviction, but remand for correction of the judgment and sentence.

FACTS

William Helkenn is the biological father of C. C was born in Minnesota in 2000. Helkenn married C's mother Tricia Anderson on January 6, 2001 in Minnesota, and shortly thereafter, the family moved to Arizona. Helkenn and Anderson separated in 2002 and C moved back to Minnesota with Anderson. In 2011, when C was 10 years old, Helkenn gained custody of C after Anderson was admitted into treatment for chemical dependency. Helkenn and C subsequently

resided in Vancouver, Washington. Through the years, the two lived with Helkenn's romantic partners, including Sarah Rockwell who was married to him from 2012 to 2014.

In September 2018, on the night of her 18th birthday, C moved into an apartment with Kai Childers. Shortly thereafter, Childers confronted C about an entry in C's diary where she had written that Helkenn had touched her "down there" and that she had a general dislike for him. Following the confrontation, C went to Rockwell's house and asked if she had known about the abuse. Rockwell stated that she had not been aware and encouraged C to contact the police. That November, C met with Deedee Pegler, a forensic interviewer with the Arthur D. Curtis Children's Justice Center. C was also examined by Karis Kerbs, a pediatric nurse practitioner.

On March 14, 2019, the State charged Helkenn with one count each of child molestation in the first degree and child molestation in the third degree. The arresting officer's declaration of probable cause included the description of events that C had relayed to Pegler. On September 20, 2021, the State filed an amended information and added two aggravating factors for each count: that the offenses were part of an ongoing pattern of abuse and Helkenn used his position of trust to facilitate the commission of the crimes.

On March 15, 2022, the court made the following rulings on motions in limine: testimony about prior acts proffered by the State was admissible under ER 404(b) to establish Helkenn's motive, intent, opportunity, absence of mistake, and

res gestae;[1] testimony from several State's witnesses about C's disclosures was admissible under the fact of complaint doctrine; and many topics the defense sought to introduce through its expert were excluded, specifically grooming or the absence of any discussion of grooming, false accusations and child suggestibility, any opinion on the forensic interview, Anderson's alcoholism, opinions about "believed-in imaginings," and the lack of corroboration in this case or in child sexual abuse cases generally.

The court determined the jury instructions on March 17. Jury instruction 14 provided that "[i]n order to convict a person of the crimes of child molestation in the first degree or child molestation in the third degree, as defined in these instructions, it is not necessary that the testimony of the alleged victim be corroborated." Helkenn later objected to this instruction and argued that it was an improper judicial comment on the evidence. While his exception was noted, the court ruled that the instruction would be given to the jury.

Trial began on March 15, 2022. C testified about multiple instances of sexual abuse by Helkenn, which started when she was in the fifth grade. She described one instance that occurred on a train ride to Minnesota for a custody hearing when she was approximately 12 years old. She explained that the encounter made her feel scared and anxious. C then testified about two episodes

---

[1] The court initially admitted the prior act evidence to establish "lustful disposition," a previously recognized exception under ER 404(b). However, later, on the order on motions in limine, "lustful disposition" was crossed out and "motive, intent, opportunity, absence of mistake and res gestae" was handwritten in its place. This change to the basis of admissibility is discussed in detail in Section III, *infra*.

of abuse in her shared home with Helkenn that occurred sometime after the incident on the train.

C further testified that, while she did not comprehend that Helkenn was abusing her at first, when she started dating her first boyfriend at approximately 16 years old, she realized that what she was experiencing with Helkenn was "not a normal relationship to have with your dad." She did not tell that boyfriend about the molestation because she was embarrassed. C testified that she did have one conversation with Helkenn about his abuse when she was a freshman in high school where Helkenn told her "he didn't mean to and he felt disgusting," and that he could get in trouble if C told anyone what had happened. Both of Helkenn's parents also testified, along with various treatment providers, the investigating officer, and other friends or close associates of C and Helkenn. Helkenn presented expert testimony of Dr. Charles Heller, a psychologist who specialized in family forensics.

Helkenn exercised his right to testify in his own defense. He stated that, to his later regret, he had prioritized previous romantic relationships to the detriment of his relationship with C. He expressed that he did have a conversation with C wherein he apologized to her, but asserted that the apology pertained to spending more time with a previous girlfriend than her. Helkenn denied sexually abusing C in any manner.

The jury convicted Helkenn as charged. It also returned special verdict findings that the State had proved the aggravating factors beyond a reasonable doubt on both counts. On May 6, 2022, the trial court sentenced Helkenn to 180

months in prison, followed by 36 months on community custody supervision by the Department of Corrections (DOC). The court imposed a $500 victim penalty assessment (VPA) and DNA collection fee.

Helkenn timely appealed.

ANALYSIS

Helkenn raises several issues on appeal and in a pro se statement of additional grounds for review (SAG), primarily focusing on a number of evidentiary rulings by the trial court and a purported instructional error. We address each in turn.

I.      Noncorroboration Jury Instruction

Helkenn asserts that the trial court's "no corroboration necessary" instruction was an improper judicial comment on the evidence. The Washington Constitution directs that "[j]udges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." WASH. CONST. art. IV, § 16. This provision prohibits a judge from expressing to the jury their personal opinions about the merits of the case or directing that a factual issue has been established as a matter of law. *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006). A jury instruction can be a comment on the evidence if it demonstrates that the court has a particular attitude toward the merits of the case. *State v. Hermann*, 138 Wn. App. 596, 606, 158 P.3d 96 (2007). However, it is well established that a jury instruction that simply and accurately sets out the law on a particular matter is not an improper judicial comment on the evidence. *See, e.g., State v. Woods,* 143

Wn.2d 561, 591, 23 P.3d 1046 (2001); *State v. Brush*, 183 Wn.2d 550, 557, 353 P.3d 213 (2015); *State v. Sinrud*, 200 Wn. App. 643, 649, 403 P.3d 96 (2017); *State v. Yishmael*, 6 Wn. App. 2d 203, 213, 430 P.3d 279 (2018), *aff'd*, 195 Wn.2d 155, 456 P.3d 1172 (2020).

First and most critically, Helkenn's challenge on this issue fails because the noncorroboration jury instruction reflects the applicable statute nearly verbatim. RCW 9A.44.020(1), a pertinent provision relating to the chapter 9A.44 offenses with which Helkenn was charged, provides that "[i]n order to convict a person of any crime defined in this chapter it shall not be necessary that the testimony of the alleged victim be corroborated."  Jury instruction 14 states that for the jury to convict Helkenn of child molestation in the first or third degree, the charges he faced at trial, "it is not necessary that the testimony of the alleged victim be corroborated."  The only difference in language between the challenged instruction and the RCW is that the former states "it is not necessary" and the latter states "it shall not be necessary."  The jury instruction is an accurate reflection of the relevant law, and case law clearly provides that such an instruction does not constitute an impermissible judicial comment.  *See Woods,* 143 Wn.2d at 591.

Additionally, *State v. Clayton* is binding on this court with regard to noncorroboration jury instructions in the circumstances presented here.  32 Wn.2d 571, 202 P.2d 922 (1949).  In *Clayton*, our state Supreme Court considered a challenge to an instruction that the jury "'may'" convict a defendant of statutory rape "'if [they] believe from the evidence and are satisfied beyond a reasonable doubt as to the guilt of the defendant . . . notwithstanding that there be no direct

corroboration of [the victim's] testimony as to the commission of the act.'" *Id.* at 572. Our Supreme Court concluded that the trial judge had "expressed no opinion as to the truth or falsity of the testimony" of the victim by issuing the challenged instruction and had appropriately reserved all questions of credibility to the jury. *Id.* at 573-74.

Helkenn asserts in his opening brief that *Clayton* is distinguishable from the instant case for two reasons. First, he cites the portion of *Clayton* that explains the instruction used in that trial included the phrase "*may* be convicted,"[2] and avers that language preserved the fact-finding function of the jury while the language of the instruction issued in Helkenn's case—that it was "*not necessary* that the testimony of the alleged victim be corroborated"—implied to the jury "that a lack of corroborative evidence could not create a reasonable doubt." (Emphasis added.) Second, he notes that the instruction in *Clayton* also included language that "'the question is distinctly one for the jury.'" *Id.* at 572. However, we review jury instructions as a whole to ensure that, when read together, they correctly advise the jury of the controlling law, do not mislead the jury, and allow the accused to present their theory of the defense. *State v. Weaver*, 198 Wn.2d 459, 465-66, 496 P.3d 1183 (2021) (quoting *State v. O'Hara*, 167 Wn.2d 91, 105, 217 P.3d 756 (2009)). Jury instruction 1 from Helkenn's trial states, "[i]t is your duty to decide the facts in this case based upon the evidence presented to you" and establishes that jurors are "the sole judges of the credibility of each witness." Although the jury in *Clayton* was informed of its role in determining facts and credibility in the same

---

[2] *Clayton,* 32 Wn.2d at 572 (emphasis added).

instruction as the no corroboration necessary language, our review does not distinguish between the inclusion of those directives in the same or separate instructions within the whole set of jury instructions. The jury instructions in this case, read as a whole, properly direct the jury that it is the exclusive decider of credibility.[3]

Helkenn also alleges that the noncorroboration instruction violated the due process guarantees of the state and federal constitutions by alleviating the State's burden to prove the charged crime beyond a reasonable doubt. Under the Fourteenth Amendment to the United States Constitution, the State bears the burden of proving every element of a crime beyond a reasonable doubt. *State v. Chacon*, 192 Wn.2d 545, 549-50, 431 P.3d 477 (2018). In the context of jury instructions, "due process is primarily concerned that the jury understands the State's burden of proof." *Id.* at 550.

Although Helkenn presents this challenge as a separate argument, due process interests are already incorporated into appellate review of judicial comments on the evidence. Again, we evaluate a challenged jury instruction in the context of the instructions as a whole. *State v. Henderson*, 192 Wn.2d 508, 512, 430 P.3d 637 (2018). Jury instruction 4 states that the "State is the plaintiff and has the burden of proving each element of each crime beyond a reasonable doubt." Jury instructions 10 and 12, the "to convict" instructions for each of the charged crimes, list and describe the elements of each crime, reiterate that the

_____

[3] Helkenn also argues that *Clayton* is no longer good law in light of *Brush*. However, *Brush* involved different circumstances than those presented here. In *Brush*, the trial court misapplied the holding of a previous case to define "prolonged period of time," 183 Wn.2d at 557, whereas in *Clayton*, the instruction was a correct statement of an applicable statute, 32 Wn.2d at 572-73.

State carries the burden of proof, and direct that "each of the following elements of the crime must be proved beyond a reasonable doubt." The court also provided jury instruction 16, which specified that the "State has the burden of proving the existence of each aggravating circumstance beyond a reasonable doubt." These instructions, alone and collectively, clearly informed the jury that it had to conclude that the State proved each element of each charge beyond a reasonable doubt before it could convict Helkenn, therefore satisfying due process.

Because jury instruction 14 accurately reflects the content of RCW 9A.44.020(1) and *Clayton* controls in these circumstances, Helkenn's assertion that the instruction constituted an improper judicial comment is without merit. His due process challenge to the jury instructions also fails.

II.    Admission of Diary Entry

Helkenn avers that the trial court erred when it allowed C to read an entry from her diary to the jury, violating the evidentiary prohibition on hearsay. Prior to trial, the State agreed with Helkenn that the diary was inadmissible hearsay and affirmatively asserted that it did not intend to use the contents of the diary entry unless they were needed to refresh C's memory or to be used for impeachment. The prosecutor specified that they could not "find a hearsay exception" that applied to the diary. At trial, Helkenn's counsel referenced the diary entry during his opening statement: "[T]he cats knocked the diary off a shelf, and the diary opened to the one page in the entire diary that contained the allegation that . . . Helkenn touched or tickled her down there." Subsequently, the State called C as a witness and, during direct examination, asked her whether she kept a diary as a child and

whether she recalled being confronted in October 2018 about a particular entry. The contents of that entry were not discussed during direct examination. However, on cross-examination, defense counsel asked C about the contents of the entry in the following exchange:

> Q. [Defense Counsel] The diary entry you talk about, your dad touched or tickled you; is that correct?
> A. Yes.
> Q. When you talked to [Pegler], and you described some incidents today, did you ever talk about your dad tickling you?
> A. No.
> Q. I'm sorry. Did you answer?
> A. No.
> Q. Okay. And is that how this all came about, the entry that you were touched or tickled?
> A. Um, yes.

Later, the defense referenced the diary again, asking C, "Do you recall writing about cutting yourself in the diary?" to which C replied, "I don't recall." On redirect, at the prompting of the State, C reviewed a diary entry dated April 7, 2015, and confirmed that it had refreshed her recollection. The State then asked C to read the entry aloud and Helkenn objected on the basis of hearsay. The court took argument on the objection outside the presence of the jury.

The State asserted that the evidence was admissible as a past recorded recollection, to demonstrate C's then-existing state of mind, to rebut a recent claim of fabrication, and because defense counsel had opened the door to its admission during cross-examination. The judge overruled the objection based on two exceptions to the hearsay rule: ER 803(a)(5), recorded recollection, and ER 801(d)(1), prior consistent statement. On appeal, the State concedes that the diary entry was not admissible under either evidentiary rule identified by the trial court.

However, it argues that the diary entry was nonetheless admissible under ER 106 and because Helkenn "opened the door" to its admission.

### A. Ruling on Admissibility

We review evidentiary rulings under an abuse of discretion standard. *Peralta v. State,* 187 Wn.2d 888, 894, 389 P.3d 596 (2017).  A trial court abuses its discretion if its decision is manifestly unreasonable, unsupported by the record, or based on an incorrect legal standard.  *State v. Burns,* 193 Wn.2d 190, 202, 438 P.3d 1183 (2019).  Although the argument for admissibility under ER 106 is raised for the first time on appeal, we are authorized to assess any argument supported by the record.  *See State v. Williams*, 137 Wn. App. 736, 743, 154 P.3d 322 (2007) ("We may uphold a trial court's evidentiary ruling on the grounds the trial court used *or* on other proper grounds the record supports." (emphasis added)).

As the rules of evidence are intended to assist in establishing the truth, limiting the admission of particular evidence after receiving only part of it has the potential to "'limit the proof to half-truths.'"  *Ang v. Martin*, 118 Wn. App. 553, 562, 76 P.3d 787 (2003) (quoting *State v. Gefeller*, 76 Wn.2d 449, 455, 458 P.2d 17 (1969)), *aff'd*, 154 Wn.2d 477, 114 P.3d 637 (2005).  A party "opens the door" to explanation or contradiction of evidence by introducing evidence that would otherwise be inadmissible if offered by the opposing party.  *State v. Ortega*, 134 Wn. App. 617, 626, 142 P.3d 175 (2006).  Opening statements can open the door to otherwise inadmissible evidence.  *State v. Wafford*, 199 Wn. App 32, 39, 397 P.3d 926 (2017).  The central question before the trial judge when considering whether a party opened the door to otherwise inadmissible evidence is "to what

extent, if any, has the statement compromised the fairness of the trial and what, if any, response is appropriate." *Id.* at 39. "The appropriate response is that which, in the discretion of the trial judge, best restores fairness to the proceeding." *Id*.

Here, the defense opened the door by referencing the diary entry three times before the State sought to introduce it by having C read it into the record verbatim: once during its opening statement and twice during its redirect examination of C, each time triggering ER 106, which is commonly referred to as the rule of completeness. ER 106 provides the following:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the party at that time to introduce any other part, or any other writing or recorded statement, which ought in fairness to be considered contemporaneously with it.

"However, 'the trial judge need only admit the remaining portions of the statement which are needed to clarify or explain the portion already received.'" *State v. Simms*, 151 Wn. App. 677, 692, 214 P.3d 919 (2009) (internal quotation marks omitted) (quoting *State v. Larry*, 108 Wn. App. 894, 910, 34 P.3d 241 (2001)). The evidence offered under the rule of completeness must be relevant, explain and contextualize the admitted portions, avoid misleading the jury, and "ensure fair and impartial understanding of the evidence." *Larry*, 108 Wn. App. at 910 (quoting *United States v. Haddad*, 10 F.3d 1252, 1258-59 (7th Cir. 1993)).

When defense counsel referenced the diary, they said that the entry described that Helkenn "touched or tickled" C. Without more, that description could mislead the jury into believing that was all that C wrote in the diary entry about the contact, minimizing her actual characterization of events or suggesting that the

contact was harmless or otherwise appropriate. The trial court acted reasonably when it allowed the State to correct that potential misinterpretation by admitting the surrounding language of the diary entry, including that C did not like when Helkenn "touches" or "tickles" her and that Helkenn "used to touch [her], like, down there." However, it was not necessary for the jury to hear the portions of the diary entry regarding C's mental health, her general impressions of Helkenn, or her confrontation with her father about his abuse in order to correct or clarify evidence that could potentially have misled the jury. Thus, the trial court misapplied the rule and erred when it admitted the entirety of the entry.

B.    Harmless Error

Because the erroneous admission of evidence is not a constitutional error, we review it under the nonconstitutional harmless error standard. *State v. Gower*, 179 Wn.2d 851, 854, 321 P.3d 1178 (2014). "Under this standard, an 'error is not prejudicial unless, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" *State v. Booth*, 22 Wn. App. 2d 565, 584, 510 P.3d 1025 (2022) (internal quotation marks omitted) (quoting *State v. Aljaffar*, 198 Wn. App. 75, 86, 392 P.3d 1070 (2017)). Prejudice is not presumed with nonconstitutional errors. *State v. Lupastean*, 200 Wn.2d 26, 50, 513 P.3d 781 (2022).

Helkenn argues that the diary entry was very prejudicial because C referred to him as "creepy" and expressed suicidal ideation. While this may be true, the material related to C's mental health was also present in other evidence, such as her live testimony, which included an express admission to having engaged in self-

harming behavior. Kerbs testified that C reported anxiety, panic attacks, and self-injury. The description of Helkenn in the diary entry as "creepy" is not found in other evidence, but that one word did not likely have a material impact on the jury, particularly in light of the other evidence it heard, like C's testimony regarding the specifics of the sexual abuse. Therefore, although the trial court erred when it admitted the diary entry, the other evidence admitted at trial, and the singular descriptor of Helkenn, renders the error harmless.

III.    Admission of Prior Acts under ER 404(b)

Helkenn challenges the admission of evidence regarding several instances of past misconduct under ER 404(b), often referred to as evidence of "prior bad acts." This included C's testimony about an incident when Helkenn molested her on a train and that of Rockwell describing a time when Helkenn watched C bathe when she was 11 or 12 years old. In 2021, the trial court admitted this evidence as satisfying the "lustful disposition"[4] basis under ER 404(b). In 2022, our Supreme Court announced that "the term 'lustful disposition' must be rejected and that it may no longer be cited as a distinct purpose for admitting evidence under ER 404(b)." *State v. Crossguns*, 199 Wn.2d 282, 290, 505 P.3d 529 (2022). The State properly concedes that "lustful disposition" is no longer a basis for admission

---

[4] In *State v. Gresham*, our Supreme Court explained that "there is one improper purpose and an undefined number of proper purposes" for admitting "other act" evidence under ER 404(b). 173 Wn.2d 405, 421, 269 P.3d 207 (2012).

While "lustful disposition" was never an enumerated exception to the prohibition set out in ER 404(b), it is one of a handful of judicially-created exceptions to the evidentiary rule. As detailed in the *Crossguns* opinion, "Washington first held that such evidence may be admissible over 100 years ago, early in our state's jurisprudence, though we did not then use the term 'lustful disposition.' We later adopted the label 'lustful disposition.'" 199 Wn.2d 282, 290-91, 505 P.3d 529 (2022) (citation omitted) (quoting *State v. Crowder*, 119 Wash. 450, 452, 205 P. 850 (1922)).

of evidence but argues that admission here was nonetheless proper under ER 404(b) to demonstrate motive, intent, opportunity, absence of mistake, and as res gestae. ER 404(b) allows for admission of evidence of "other crimes, wrongs, or acts" that would otherwise "not [be] admissible to prove the character of a person," if the evidence shows "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake."

<u>Ruling on Admissibility</u>

As the interpretation of an evidentiary rule is a question of law, we review it de novo. *State v. Foxhoven,* 161 Wn.2d 168, 174, 163 P.3d 786 (2007). According to our Supreme Court, in order to properly admit evidence of prior misconduct under ER 404(b):

> "the trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative values against the prejudicial effect."

*State v. Gresham*, 173 Wn.2d 405, 421, 269 P.3d 207 (2012) (quoting *State v. Vy Thang,* 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)). There is a presumption that evidence of prior misconduct is inadmissible, and it is the burden of the party seeking to introduce such evidence to satisfy the first three factors. *Id.* at 420. The fourth factor ensures that the proffered evidence does not run afoul of ER 403.[5]

---

[5] ER 403 states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needles presentation of cumulative evidence."

*Id*. at 421. "This analysis must be conducted on the record." *State v. Arredondo*, 188 Wn.2d 244, 257, 394 P.3d 348 (2017).

The evidence in question here was originally admitted as relevant to establish Helkenn's "lustful disposition" toward C and an analysis of the rule's four factors was conducted on the record during the hearing addressing motions in limine. Before the trial in this case, however, our Supreme Court issued its opinion in *Crossguns* that disallowed "lustful disposition" as a basis for admission and also explained that the "rejection of the label 'lustful disposition' does not modify our established doctrine of allowing '[e]vidence of other crimes, wrongs, or acts' to be admitted as 'proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident' pursuant to ER 404(b)." 199 Wn.2d at 285-286 (alteration in original).

In Helkenn's case, the trial court noted that *Crossguns* "made a fairly big change in the law on lustful disposition evidence." The State responded that it was "offering the same evidence under the motive, intent . . . absence of mistake, or common scheme or plan" bases for admission. Neither the State nor the court articulated any reasoning as to why admission of the evidence was warranted under any of these alternate grounds. Defense counsel later renewed their objection to exclude the evidence in light of *Crossguns*. The court again ordered it admitted, but failed to conduct any analysis on the record under the newly proffered bases. It stated the following:

> [T]he *Crossguns* case is a little bit confusing because it talks about an outmoded doctrine, but it clearly does not do away with [ER] 404(b). And . . . the analysis is the same as to the phrase "lustful disposition." I don't know that I've ever actually heard anybody use it

in a trial. It's a basis for—was a basis for admission of testimony. It no longer is on its own. But my ruling stands under [ER] 404(b).

The court simply crossed out "lustful disposition" on its order on motions in limine and handwrote "motive, intent, opportunity, absence of mistake, and res gestae" in its place.

As the State concedes in its brief, the analysis of whether certain evidence is admissible under ER 404(b) *must be conducted on the record*, and the party attempting to introduce the evidence must identify its intended purpose. While the court in *Crossguns* affirmed the trial court's admission of evidence of prior sexual misconduct for other permissible purposes that included "intent, plan, motive, opportunity, [and] absence of mistake or accident," *Id*. at 287, the trial court here failed to conduct any legal analysis on the record as to the other permissible purposes presented by the prosecutor, including whether the probative value outweighed any prejudicial effect. Accordingly, the trial court abused its discretion by misapplying the controlling law and admitting the challenged evidence under ER 404(b) without first performing the required analysis on the record.

Such an evidentiary error is harmless when the evidence is admissible for a proper purpose. *State v. Sublett*, 156 Wn. App. 160, 196, 231 P.3d 231 (2010), *aff'd*, 176 Wn.2d 58, 292 P.3d 715 (2012). We may uphold the admission of ER 404(b) evidence on any ground that the record supports, "consider[ing] bases mentioned by the trial court as well as other proper bases on which the trial court's admission of evidence may be sustained." *Williams*, 137 Wn. App. at 743; *State v. Powell*, 126 Wn.2d 244, 259, 893 P.2d 615 (1995).

The State argues that the evidence regarding the train and bathing incidents is admissible to show the permissible purposes of motive, intent, opportunity, absence of mistake, and as res gestae to show C's state of mind as to her delayed disclosure. It also contends that the challenged evidence was admissible to prove the aggravating factors on each count. Helkenn avers the evidence was only relevant to show propensity and that, even if it was logically relevant to other permissible purposes, its probative value was substantially outweighed by the risk of unfair prejudice.

*Crossguns* is instructive here. The State charged Crossguns with one count of both rape of a child and child molestation against his daughter, R, and alleged two aggravators on each count—that Crossguns abused a position of trust and that the crimes were part of an ongoing pattern of sexual abuse. *Crossguns,* 199 Wn.2d at 286. When the State moved to admit evidence concerning his prior uncharged sexual abuse of R under ER 404(b), Crossguns opposed and argued it was improper propensity evidence. *Id*. at 286-87. Although the trial court erred when it admitted the evidence to show "lustful disposition," our Supreme Court explained that the error was harmless as the evidence was admissible to show intent, plan, motive, opportunity, absence of mistake, and to prove the aggravating factors for each count. *Id*. at 296.

The *Crossguns* court was clear that its holding did "not disturb our precedent permitting evidence of collateral misconduct relating to a specific victim for appropriate purposes under ER 404(b)." *Id*. at 290. The court noted that evidence admitted to show the lustful disposition of the accused "has generally

been admissible for some other, proper purpose, such as intent, motive, opportunity, common scheme or plan, preparation, and absence of accident or mistake." *Id*. at 294. In cases concerning the sexual assault of children, such evidence may be admissible because it is "necessary to demonstrate the dynamics between the offender and their victim" and the manipulation of the child's trust. *Id*. at 295. "Evidence of such manipulation," the court explained, "shows the planning and intent involved in building a relationship with the child victim in order to obtain the access and opportunity to commit the acts of sexual assault." *Id*. Thus, the court concluded, "evidence of prior sexual misconduct may be relevant and admissible in cases such as this that involve sexual abuse in the context of a relationship with unequal power dynamics." *Id*.

Here, like in *Crossguns*, the ER 404(b) evidence at issue is other uncharged sexual misconduct between the defendant and the victim. Just as the evidence in *Crossguns* was key to show the dynamics of the relationship and the manipulation of the victim, the same is true here. The evidence regarding the bathing and train incidents demonstrate that Helkenn developed and manipulated C's trust from a position of power, which "shows the planning and intent involved in building a relationship with the child victim in order to obtain the access and opportunity to commit the acts of sexual assault." *Id*. Here, the State charged the same aggravating circumstances as it did in *Crossguns* and alleged that Helkenn engaged in a pattern of sexual abuse and that he abused a position of trust to facilitate commission of the crimes against C. The evidence was plainly relevant and admissible to prove both aggravating factors. And, for the same reasons as

in *Crossguns*, the evidence here was also relevant and necessary "as res gestae in the case to show [C's] state of mind for her delayed disclosure." *Id*. at 296. Because we conclude that the evidence was admissible for these purposes, "we need not address the trial court's other reasons for admissibility." *State v. Wilson*, 60 Wn. App. 887, 890, 808 P.2d 754 (1991).

Regarding the trial court's failure to balance the probative value of the evidence against any undue prejudice on the record, such an evidentiary error requires reversal only "if the error, within reasonable probability, materially affected the outcome of trial." *State v. Halstien*, 122 Wn.2d 109, 127, 857 P.2d 270 (1993). Though "the potential for prejudice from admitting prior acts is 'at its highest' in sex offense cases," the prior misconduct here was admissible for permissible purposes and highly probative to show res gestae and prove the aggravating factors. *Gower*, 179 Wn.2d at 857 (internal quotation marks omitted) (quoting *Gresham*, 173 Wn.2d at 433); s*ee State v. Lough*, 125 Wn.2d 847, 863, 889 P.2d 487 (1995) ("[T]he true test of admissibility of unrelated crimes is not only whether they fall into a specific exception, but whether the evidence is relevant and necessary to prove an essential ingredient of the crime charged."). Under these circumstances, the trial court's failure to balance on the record whether the probative value of the evidence was substantially outweighed by the danger of undue prejudice had no reasonable probability of materially affecting the outcome of this trial. Because the evidence was admissible on appropriate grounds and it is clear from the record that it was not substantially more prejudicial than probative, the error is harmless. *See Halstien*, 122 Wn.2d at 127.

Helkenn also claims the trial court erred in failing to provide a limiting instruction for the jury's consideration of the ER 404(b) evidence. Pursuant to ER 105, when evidence is admissible for one purpose but not another, "the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." When neither party requests such an instruction, a "trial court is not required to sua sponte give a limiting instruction for ER 404(b) evidence." *State v. Russell*, 171 Wn.2d 118, 124, 249 P.3d 604 (2011). As our Supreme Court has emphasized:

> Under the plain language of ER 105, the trial court has a duty to issue a limiting instruction only *upon request* for such an instruction. Nothing in ER 105 creates an affirmative duty on the part of the trial court to sua sponte give a limiting instruction in the context of ER 404(b) evidence. This holding is consistent with over 40 years of Washington case law expressly addressing this issue.

*Id.* at 123. Because Helkenn did not request a limiting instruction for the ER 404(b) evidence and the trial court had no duty to provide the instruction sua sponte, his claim fails. *Id.*; *see State v. Noyes*, 69 Wn.2d 441, 447, 418 P.2d 471 (1966) ("[A] request for a limiting instruction is a prerequisite to a successful claim of error on appeal.").

IV.    Fact of Complaint Doctrine

Helkenn avers that the trial court erred when it admitted testimony from witnesses through an improper application of the fact of complaint doctrine. The doctrine is a case law exception to the prohibition on hearsay that permits the introduction of evidence that the alleged victim made a complaint to someone after the assault. *State v. DeBolt*, 61 Wn. App. 58, 63, 808 P.2d 794 (1991). The

admission of evidence under this doctrine is limited; such evidence is only admissible to demonstrate that the victim reported the crime to someone in a timely manner and is not admissible for the truth of the matter asserted. *State v. Martinez,* 196 Wn.2d 605, 611, 476 P.3d 189 (2020). We review the trial court's admission of evidence pursuant to the fact of complaint doctrine under an abuse of discretion standard. *Id.* at 614.

Helkenn concedes that the trial court did not err when it admitted the testimony of C's disclosure of abuse to a friend when they were in the eighth grade because it was contemporaneous to the molestation, but asserts that her reports to Pegler, Rockwell, and Childers were "plainly untimely," as they occurred roughly two years after C stated the abuse stopped. The State argues that Helkenn did not preserve the issue of timeliness on appeal because his objection was a vague statement that the history of the case and the "way the complaints came out after" was not a challenge to timeliness. While it is true that Helkenn did not use the word "timely" or anything similar, the phrasing of his argument on objection, "the way the complaints came out *after,*" indicates a challenge to the timing of the complaints. (Emphasis added.) This claim was preserved and is properly before us.

"A complaint is timely if it is made when there is an 'opportunity to complain.'" *Id.* (internal quotation marks omitted) (quoting *State v. Griffin,* 43 Wash. 591, 597, 86 P. 951 (1906)). Reviewing courts generally "leave it in the able hands of the trial court to determine what constitutes a timely complaint based on the surrounding circumstances." *Id.* at 615. Because child abuse is typically

an ongoing pattern of behaviors, trial judges have the authority to admit evidence to help the jury understand why a victim waited to report sexual abuse. *Id.* Helkenn points to the holding in *State v. Chenoweth* that reporting abuse one year after its occurrence was untimely. 188 Wn. App. 521, 533, 354 P.3d 13 (2015). He argues that C alleged the last instance of abuse occurred when she was 16, a full two years before she reported it. Although *Chenoweth* is similar in that it also involved an allegation of sexual assault by a child against their father, the factual distinctions are significant in the consideration of timeliness. The victim in *Chenoweth* was an adult at the time of the abuse, lived with both parents, and Chenoweth had moved out of the house over a year before the victim reported the abuse. *Id.* at 524. Here, although various romantic partners lived with C and Helkenn at different times, C depended on Helkenn as her primary parent and caregiver from the point she moved in with him at age 11. She testified that she was afraid she would "get in trouble" if she revealed that her father had been the one abusing her. On C's 18th birthday, she moved out of Helkenn's house and reported the abuse approximately one month later. It is reasonable that C felt that her earliest opportunity to complain was after she no longer lived with Helkenn, and she reported the abuse shortly after she moved out. Particularly in light of the significant discretion conferred on the trial court in considering the circumstances and admitting evidence under the fact of complaint doctrine, we conclude that C's complaints were timely and that the trial court did not err in admitting this evidence.

V.      Right To Present a Defense

Helkenn contends that his constitutional "right to present a defense" was violated when the trial court improperly excluded photographs of the home where he and C had resided.  The concept of the right to present a defense is not an enumerated constitutional entitlement.  Rather, the United States Supreme Court has identified the Sixth Amendment rights to confrontation of adverse witnesses and to testify in one's defense as "essential to due process," *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 1045, 35 L. Ed. 2d 1019 (1973), and "described the right to present such testimony as the 'right to present a defense.'"  *State v. Broussard*, 25 Wn. App. 2d 781, 785, 525 P.3d 615 (2023) (quoting *Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct 1920, 1923, 18 L. Ed. 2d 1019 (1967)).  Chambers sought to admit evidence that another individual confessed to the murder for which Chambers had been charged (though the confession was later repudiated).  *Chambers*, 410 U.S. at 287-88.  Although the trial court allowed the witness to testify, a Mississippi common law rule prevented Chambers from treating the witness as hostile in order to impeach his testimony. *Id.* at 294.  The Court held that, because Mississippi law prevented Chambers from calling witnesses whose testimony was essential to the determination of guilt or innocence, the law violated the Sixth Amendment right to present witnesses in his favor.  *Id.* at 295, 302.

One year after *Chambers*, the Court again explored the Sixth Amendment right to confront witnesses in *Davis v. Alaska*.  415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974).  Davis sought to establish through cross-examination the

possibility that the State's primary witness testified out of fear that his probation for a prior juvenile offense would be revoked. *Id.* at 310-11. However, relying on a statute that barred the introduction of juvenile adjudications, the trial court excluded evidence of the offense, effectively preventing Davis from discrediting the witness's testimony. *Id.* at 311. The Supreme Court reversed the conviction and ruled that it violated "the right of effective cross-examination." *Id.* at 318. The Court held the application of the statute prohibited Davis from making a record that showed why the witness might have been biased and that, in order for such impeachment to be effective, the accused must be able to present facts to a jury from which it could "draw inferences relating to the reliability of the witness." *Id.*

Washington jurisprudence also focuses on newly promulgated or infrequently cited rules of evidence in outlining what is entailed in the right to present a defense. For example, in *State v. Hudlow*, our state Supreme Court considered the prejudicial and probative value of evidence that was potentially inadmissible under the then-newly created rape shield law. 99 Wn.2d 1, 659 P.2d 514 (1983). It held that proffered evidence is not precluded by the rape shield law when it is of high probative value. *Id.* at 16. In *State v. Chicas Carballo*, this court considered evidence that had been excluded pursuant to an evidentiary rule, ER 413, that had gone into effect just prior to trial and prohibited the introduction of evidence pertaining to an individual's immigration status, absent satisfaction of particular procedural requirements. 17 Wn. App. 2d 337, 345, 486 P.3d 142 (2021). The trial court's application of the rule prevented Chicas Carballo from impeaching the only witness to the crime by questioning her about a possible

motive to lie that was supported by the record. *Id.* at 347. This court reversed because the excluded evidence was highly probative and, in fact, key to the defense theory of the case. *Id.* at 350-51.

The central consideration in all of these cases is whether both parties receive a fair trial. *State v. Ritchie*, 24 Wn. App. 2d 618, 634, 520 P.3d 1105 (2022). "[T]hat concern is heightened when a new or antiquated rule appears to threaten the defendant's right to a fair trial." *Id.* The concern is lessened when the applied rule is well-established like ER 403, which requires that even relevant evidence must not be unfairly prejudicial in order to be admissible. *Id.* at 634-35. The right to present a defense is not absolute; evidence that is otherwise irrelevant or inadmissible does not become admissible through the right to present a defense. *Broussard*, 25 Wn. App. 2d at 786. "Evidence is relevant if it tends to prove or disprove the existence of a fact *of consequence* to the outcome of the case." *Ritchie*, 24 Wn. App. 2d at 627 (emphasis added). However, even if the evidence is relevant, the court may properly exclude it if it is only minimally relevant, repetitive, or poses an undue risk of harassment, prejudice, or confusion of the issues. *Broussard*, 25 Wn. App. 2d at 786. In short, if the defendant is afforded the opportunity to present their theory of the case, "the exclusion of some aspects of the defendant's proffered evidence will not amount to a violation of the defendant's constitutional rights." *Ritchie*, 24 Wn. App. 2d at 635.

We conduct a two-step analysis when considering whether an evidentiary ruling violated the right to a fair trial through the presentation of a defense. *State v. Arndt*, 194 Wn.2d 784, 797, 453 P.3d 696 (2019). The first step is to review the

evidentiary ruling under an abuse of discretion standard. *State v. Jennings*, 199 Wn.2d 53, 58, 502 P.3d 1255 (2022). "'A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons.'" *Arndt*, 194 Wn.2d at 799 (quoting *State v. Lord*, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007)). If the ruling amounts to an abuse of discretion and results in prejudice, the analysis ends. *Jennings*, 199 Wn.2d at 59. If the trial court did not abuse its discretion or the abuse of discretion results in harmless error, we consider de novo whether the exclusion of evidence violated the defendant's right to present a defense. *Id.* at 58.

Helkenn sought to introduce photographs of every room in his home. He acknowledged that the pictures did not accurately reflect the house at the time C lived there because the rooms had been reconfigured, but he maintained that the layout of the home was relevant to the jury's overall analysis of where the alleged abuse occurred and to challenge C's testimony that she had been unable to hear Helkenn and a prior live-in girlfriend arguing. The court heard from both parties and recognized that photographs could be relevant if they portrayed the home at the time C was living there, but noted that the rooms had since been "changed around," and ultimately stated, "I'm not seeing a lot of relevance." Further, the court reasoned, there was no allegation that anyone was in a different room at the time of the abuse, and whether C could have heard Helkenn arguing with his girlfriend was a collateral issue. The exchange between the judge and counsel for both parties demonstrates reasonable consideration of the arguments for and against admission of the photographs. The trial court did not abuse its discretion

in making this evidentiary ruling as the photographs were not relevant and potentially confusing for the jury.

Having concluded that the trial court did not abuse its discretion in its evidentiary ruling, the second step in the analysis is to assess whether the defendant's right to present a defense was violated under the guarantees of constitutional due process. *Jennings*, 199 Wn.2d at 58. In previous cases, this phase of the analysis has been performed under two distinct frameworks. In *Arndt* and *Jones,* 168 Wn.2d 713, 230 P.3d 576 (2010), the focus was on whether the relevant evidence in question constituted the entirety of the defendant's defense and was highly probative. *Jennings*, 199 Wn.2d at 64. In *Hudlow*, the court "balance[d] the defendant's right to produce relevant evidence versus the state's interest in limiting the prejudicial effects of that evidence." 99 Wn.2d at 16. These two frameworks overlap, as the courts in *Arndt* and *Jones* also applied the balancing test in their respective analyses. *Jennings*, 199 Wn.2d at 64. Nevertheless, any distinction between the methods of analysis is immaterial in these circumstances as the information Helkenn seeks to introduce is *not* relevant and there is "no constitutional right to present *irrelevant* evidence." *Jones*, 168 Wn.2d at 720. Because Helkenn's proffered photographs had no potential to make any fact of consequence to the outcome of this action any more or less probable, the evidence was properly excluded and his "right to present a defense" was not infringed.

VI.     Cumulative Error

Helkenn argues that the cumulative effect of the errors he presents on appeal deprived him of a fair trial. "Under the cumulative error doctrine, a defendant may be entitled to a new trial when cumulative errors produce a trial that is fundamentally unfair." *State v. Emery,* 174 Wn.2d 741, 766, 278 P.3d 653 (2012). Even if any individual error standing alone would otherwise be harmless, the doctrine may warrant reversal when the errors are taken in total. *State v. Weber,* 159 Wn.2d 252, 279, 149 P.3d 646 (2006). "The doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial." *Id.*

Helkenn argues that any combination of the errors he has presented materially affected the outcome of the trial and reversal is required. However, only two errors actually occurred: the admission of the diary entry in its entirety and the admission of the testimony about the prior acts of watching C bathe and the train incident. More critically, each error was harmless. The court's admission of the whole diary entry presented information to the jury that was largely repetitive of other evidence, with the exception of one adjective used to describe Helkenn, "creepy." Accordingly, we deemed that error harmless as there is no reasonable probability, in light of the totality of the properly admitted evidence, that this single word materially affected the verdict. Further, while the court also erred when it admitted the prior bad acts evidence without conducting its analysis on the record as required by the rule, there was ample evidence on which a reasonable jury could have relied to convict Helkenn without the ER 404(b) evidence. Even

considered together, these two errors did not result in a fundamentally unfair trial and therefore do not require reversal under the cumulative error doctrine.

VII.     DOC Supervision Fees

Finally, Helkenn asserts that the DOC community custody supervision fees imposed in his judgment and sentence are no longer required as the result of a legislative amendment that became effective after sentencing. LAWS OF 2022, ch. 29, § 8; RCW 9.94A.703. This court has previously held that this amendment applies to cases on direct appeal. *State v. Wemhoff*, 24 Wn. App. 2d 198, 202, 519 P.3d 297 (2022). The State also properly concedes that the supervision fees should be removed from the judgment and sentence pursuant to the change in RCW 9.94A.703. Accordingly, we remand for the trial court to strike the supervision fees.

VIII.     Statement of Additional Grounds for Review

In his pro se SAG, Helkenn asserts a number of additional challenges also require reversal, however none are availing.

A.     Judicial Bias

Helkenn first asserts that the trial judge made an improper comment on the evidence which "revealed unconscious bias that existed throughout the majority of the trial." The comment at issue occurred during sentencing, days after the jury had reached a verdict and been released. Immediately before imposing Helkenn's sentence, the judge stated, "[p]robably 20 seconds after she opened her mouth, I believed everything that happened," in regard to C's testimony on the first day of

trial. Helkenn argues that "several rulings by the [c]ourt appear to be influenced by this bias," in violation of the Washington State Constitution and "the defendant's right to a fair trial." However, the jury unanimously convicted Helkenn well before the statement at issue here was made. Helkenn offers no authority that a judicial remark outside the presence of the jury could constitute a prejudicial comment on the evidence and we decline to further consider this argument.

Helkenn also asserts that the judge's adverse rulings on objections during the trial, rulings on the State's motions in limine to exclude portions of Heller's testimony, and, "the sense that the jury was rushed to reach a verdict and comments made by the [c]ourt in the presence of the jury" demonstrate bias in this case. Judicial rulings alone generally do not constitute a valid demonstration of bias. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 692, 101 P.3d 1 (2004). The bare assertions that Helkenn presents on this issue are not sufficient to support a conclusion of judicial bias without argument that is supported by the record. "[An] appellate court is not obligated to search the record in support of claims made in a[n] [appellant]'s statement of additional grounds for review." RAP 10.10(c).

Helkenn also highlights several objections made by the defense and the State in order to demonstrate the purported judicial bias. Alone, rulings adverse to Helkenn do not establish bias. Helkenn only generally references comments made by the court and the "sense" that the jury was rushed to support this aspect of his claim of judicial bias. He fails to point to specific evidence of this "sense" in the record, thus his claim is not sufficiently supported to warrant review. Again,

under RAP 10.10(c), we are not obligated to search the record for support of such claims and Helkenn has failed to establish judicial bias.

B.      Hastening the Verdict

Helkenn next appears to argue that the judge made comments that inappropriately rushed the jury to render a verdict.  Helkenn points to comments the judge made during voir dire about the potential length of the trial as support for this theory and notes in particular that the judge stated that it may take the jury extra time to deliberate.

Manifest errors affecting constitutional rights may be raised for the first time on appeal.  RAP 2.5(a)(3).  The defendant must show an error actually prejudiced their rights at trial in order to demonstrate a manifest error effecting a constitutional right.  *State v. Kirkman*, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007).  "A claim of judicial coercion affecting a jury verdict is such an error that we will review."  *State v. Ford*, 171 Wn.2d 185, 188, 250 P.3d 97 (2011).  To prevail on this claim, Helkenn "must establish a reasonably substantial possibility that the verdict was improperly influenced by the trial court's intervention."  *State v. Watkins*, 99 Wn.2d 166, 178, 660 P.2d 1117 (1983).  However, the defendant must first demonstrate that the jury was within its deliberative process when the allegedly coercive statements were made.  *Ford,* 171 Wn.2d at 189.

As in *Ford*, Helkenn fails at this threshold showing.  None of the comments cited in the SAG in support of this claim were made during the deliberative process.  In fact, there is no evidence that the trial judge had any contact with the jurors

during deliberation. Helkenn has failed to carry his burden on appeal to establish entitlement to relief on this basis.

C.    Exclusion of Expert Testimony

Helkenn also challenges the exclusion of six portions of Heller's intended testimony, specifically those regarding false allegations.[6] ER 702 establishes, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." As with other evidentiary rulings, this court reviews the admissibility of expert testimony under an abuse of discretion standard. *State v. Aguirre*, 168 Wn.2d 350, 359, 229 P.3d 669 (2010). "The trial court necessarily has broad discretion in determining whether expert testimony should be admitted under ER 702, and we will reverse the trial court's evidentiary ruling only if it is based on unreasonable or untenable grounds." *State v. Rafay*, 168 Wn. App. 734, 783-84, 285 P.3d 83 (2012).

i.    False Accusations

Helkenn avers that the general testimony Heller would have given about issues related to false confessions, such as suggestibility and recantation, should have been permitted because the State was allowed to present expert testimony

_____

[6] The State sought to exclude the following six aspects of Heller's anticipated testimony on: false accusations, grooming or the absence of grooming, the forensic interview process, the potential psychological impacts of a parent's alcoholism on a child, believed or imagined fantasies, and the lack of corroboration in this case and child sex cases generally. Helkenn's challenge in his SAG focuses primarily on the first topic, although he briefly addresses others. As he does not provide argument regarding the forensic interview or the concept of believed fantasies, we decline to consider those topics. RAP 10.10(c) ("[T]he appellate court is not obligated to search the record in support of claims made in a[n] [appellant's] statement of additional grounds for review.").

on general topics such as the demeanor of the subject during forensic interviews and appropriate emotional responses. The court heard argument from both parties regarding the admissibility of the proffered testimony from Heller on false accusations and child suggestibility and, in considering the parties' respective contentions, commented that Helkenn could make the case that the witnesses' testimony was contrived through cross-examination. The court ultimately granted the State's motion to exclude, finding the testimony to be "speculative and [a] comment on the witness credibility in this case." Helkenn fails to demonstrate how this ruling was an abuse of discretion.

### ii. Grooming

Helkenn next argues that the trial court erred when it permitted the State to introduce evidence implying grooming behavior but excluded Heller's testimony presenting an opposing view. The court ruled that the portion of Heller's testimony that pertained to the absence of grooming would confuse the jury, particularly because it had already prohibited the State from introducing testimony from C that Helkenn had groomed her. The judge also stated that the "absence of grooming is really not relevant or helpful to the jury" because "the lack of it doesn't mean that the abuse didn't happen." The trial court did not err when it excluded testimony from Heller regarding grooming.

### iii. Alcoholism

Helkenn also challenges the exclusion of Heller's testimony about Anderson's alcoholism and argues that the State presented incorrect facts regarding the time period when C lived with Anderson. The court granted the

motion to exclude based on relevance and speculation, as Anderson was not part of the household at the time C claims she was abused by Helkenn. Regardless of C's age when she went from living with Anderson to live in Helkenn's home, it was reasonable for the trial court to rule that the behavioral health condition of someone who did not reside with C during the period of the purported sexual abuse was irrelevant and speculative. While Helkenn notes that C was still visiting her mother after the abuse allegedly began, in contrast to the State's assertion about the timeline of C's contact with Anderson, that argument is also irrelevant because Helkenn did not claim that Anderson committed the charged acts instead of him. Further, although Helkenn contends that the State acknowledged Heller's testimony should have been allowed, he provides no citation to the record to support this particular claim. Again, he has failed to carry his burden on this challenge.

### iv.      Lack of Corroboration

Helkenn next asserts that the trial court erred when it excluded testimony from Heller about the lack of corroboration in this case and in child sex abuse cases generally. When it granted the motion to exclude this particular evidence, the trial court noted that any such testimony would be in violation of RCW 9A.44.020(1), which, as established in Section I, *supra*, states, "In order to convict a person of any crime defined in this chapter it shall not be necessary that the testimony of the alleged victim be corroborated." The court also reasoned that such testimony would confuse the jury. As the jury would later be given jury instruction 14 on noncorroboration, it was reasonable for the court to find that

expert testimony that contradicted the court's explicit directive would be confusing. The crux of this particular challenge seems to be C's credibility, which is nearly identical to Helkenn's attack on the exclusion of testimony regarding false accusations. As with that particular challenge, Helkenn was free to explore this area of the defense theory of the case through cross-examination and the presentation of other witnesses.

> v.      Right To Present a Defense

Finally, Helkenn contends that the exclusion of Heller's testimony interfered with his "right to a fair defense." There is no express right to a "fair defense" and, again, the right to present a defense is not unlimited; it does not override the rules of evidence, specifically those pertaining to relevance and confusion of the jury. *See* ER 401, 402, 403; *Broussard*, 25 Wn. App. 2d at 786. Helkenn was not prevented from developing his case by utilizing cross examination of C and other witnesses for the State in order to call their credibility into question. Helkenn's right to present a defense was not violated by the exclusion of the identified portions of Heller's intended testimony.

Helkenn fails to establish entitlement to relief on his various evidentiary challenges. Accordingly, we affirm the conviction, but remand for the trial court to strike the DOC supervision fees.

WE CONCUR:

_Hazelrigg, ACJ_

_Feldman, J._

_Mann, J._